Michael James ARDOIN,
Plaintiff-Appellant,

v.

J. RAY McDERMOTT & CO.,
Defendant-Appellee.

No. 80–3257
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 30, 1981.

Rehearing and Rehearing En Banc
Denied May 11, 1981.

Michael J. Samanie, Robert L. Barrios, Herbert W. Barnes, Houma, La., for plaintiff-appellant.

John T. Nesser, III, Joseph W. Looney, New Orleans, La., for defendant-appellee.

Before GEE, RUBIN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Michael James Ardoin sued his employer, J. Ray McDermott, Inc., under the Jones Act, 46 U.S.C. § 688 (1976), seeking to recover damages for injuries he allegedly suffered while attempting to lift a padeye used in the salvage of an offshore drilling platform. Following relatively extensive discovery, the parties filed cross motions for summary judgment on the issue of seaman's status. The parties agreed that the facts necessary to determine the question whether Ardoin was a Jones Act seaman were essentially undisputed and suggested that the issue presented by their motions was a legal one. Following a brief hearing on the motions, the court granted summary judgment for McDermott on the ground that Ardoin was not a seaman. On appeal, Ardoin argues first, that the court should have granted his summary judgment motion, not McDermott's, and, second, that in any event, McDermott's motion should have been denied and the issue of seaman's status submitted to the jury.

With regard to Ardoin's first contention, we note that the district court's denial of his motion for summary judgment is an interlocutory order and, as such, is unappealable, *Fluor Ocean Services, Inc. v. Hampton*, 502 F.2d 1169 (5th Cir. 1974). Decisions on motions for summary judgment under Fed.R.Civ.P. 56 are appealable only if such determinations have the effect of finally disposing of the action. 10 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2715 (1973). In this case, the district court's decision to grant summary judgment for McDermott is such a final order because the determination that Ardoin was not a Jones Act seaman effective-

ly terminated the suit. Considered apart from the decision to grant summary judgment for McDermott, the decision to deny Ardoin's summary judgment motion had no such effect. The only question Ardoin may properly present in this appeal is whether the district court erred in granting summary judgment for McDermott. We conclude that it did.

## I. THE UNDISPUTED FACTS

The facts determinative of the question whether Ardoin was or was not a Jones Act seaman are, as the parties concede, not seriously disputed. Ardoin was employed by McDermott as a structural welder. McDermott employs structural welders to perform the cutting and welding incident to the construction and salvage of offshore drilling platforms.

In an offshore construction job, the major portions of the structure, the "jacket" or base, and the deck of the platform, are fabricated onshore. These structures are then loaded aboard a barge, known as the "material" barge, and towed out to sea. When they reach their destination, these heavy structures are lifted off the material barge and placed in position by a crane located on another barge called the derrick barge. Structural welders, such as Ardoin, do the welding necessary to secure the pilings that are driven into the legs of the platform, cut these pilings to the height of the legs and weld the deck to the jacket. Sometimes they also weld the drilling or production equipment onto the deck of the platform as part of the construction process. In the case of a salvage operation, where a platform is to be dismantled rather than constructed, structural welders cut the deck into sections and sever the pilings in order that the platform may be removed from the site.

Although structural welders, whether working on a construction or salvage operation; spend most of their time working on the platform, the welding equipment they use is located aboard, and operated from, the derrick barge. The structural welders occasionally cut or fabricate iron for the structure on board the barge. They may also, from time to time, do some minor maintenance work on the barge itself, although there is ordinarily a barge welder who is responsible for such chores.

The structural welders, who may number as many as 15 to 20 on a large project, eat and sleep aboard the derrick barge, as do the "riggers," who are involved in the operation of the crane, the engineers, who do most of the maintenance on the derrick barge, the barge welders, the cooks and galley hands and the barge captain. Structural welders do not work fixed offshore shifts, nor do they always work with the same barge; they may be assigned to work on a project in conjunction with any one barge from a fleet consisting of approximately a half-dozen derrick barges operated by McDermott. Welders such as Ardoin are customarily required to remain offshore for a minimum of ten days, although if a project is completed in less than ten days, they may return to shore sooner. If the project requires more than ten days to complete, the welders usually remain until it is finished. Under these circumstances, they may remain offshore for as long as a month.

In December, 1976, Ardoin was called offshore to work with McDermott's Derrick Barge No. 8 on the dismantling of an inoperative drilling platform. Ardoin was assigned to cut the platform into pieces which would then be lifted by the crane on Derrick Barge No. 8, placed on another barge and taken away. Ardoin's Jones Act claim is premised upon an injury to his back which he claims to have suffered during his first day on this job when he attempted to lift a padeye into position on the deck of the platform. Ardoin remained at work and stayed on the barge five more days, until the salvage operation was completed. He continued to work for McDermott, in the same capacity, for approximately eighteen months until June, 1978, when, according to Ardoin, his back injury forced him to leave his job.

## II. THE RIDDLE REDIVIVUS

The Jones Act grants "any seaman who shall suffer a personal injury in the course of his employment" the right to recover damages for such injuries if they are caused by the negligence of the seaman's employer. The statute does not define the term "seaman." Consequently, that species of maritime worker who is entitled to sue under the Jones Act has been identified by negative implication from the terms of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et. seq., which provides an exclusive remedy in the form of workers' compensation for disability or death of maritime workers not "master[s] or member[s] of a crew of any vessel." In *Swanson v. Marra Bros. Inc.*, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946), the Supreme Court concluded that the term "seaman," as used in the Jones Act, encompassed those persons who were "members of the crew of a vessel plying in navigable waters." *Id.* at 7, 66 S.Ct. at 872. Of course, the phrase "member of the crew" is only a slightly more illuminating description of the class of persons entitled to sue under the Jones Act than the word "seaman." Thus, the meaningful contours of the class of maritime workers affected by the Jones Act have only been defined by judicial glosses on terms "seaman" and "member of the crew" and case-by-case analysis of the facts concerning the particular circumstances of a plaintiff's employment in light of these legal definitions.

In *McKie v. Diamond Marine Co.*, 204 F.2d 132 (5th Cir. 1953), we set forth a definition of the phrase "member of the crew" which, although restated and refined since, still articulates the basic compass of the term "seaman" as used in the Jones Act.

> The essential and decisive elements of the definition of a "member of a crew" are that the ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation.

204 F.2d at 136. This definition has been our guide as we have attempted to resolve numerous riddles concerning the status of various types of ambiguous-amphibious workers involved in the offshore petroleum industry. *See Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959) ("When is a roughneck a seaman?"). In this case the riddle is revived in the form of the question "When is a structural welder a seaman?"

We think that in this case, as in many similar ones, the riddle is not for us to answer. We have sometimes described the problem presented by the issue of seaman's status as a mixed question of law and fact, *Holland v. Allied Structural Steel Corp., Inc.*, 539 F.2d 476 (5th Cir. 1976); *Keener v. Transworld Drilling Co.*, 468 F.2d 729 (5th Cir. 1972). It may be more helpful to describe the issue as one whose resolution requires "the application of legal principles to specific underlying facts about what the parties did or did not do." *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342 (5th Cir. 1980). Regardless of the way in which the process of determining whether a particular plaintiff is a Jones Act seaman is described, it is clear that except in cases where the underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts, the riddle of seaman's status is one for the jury. *Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447 (5th Cir. 1980); *Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir. 1979); *Barrios v. Louisiana Construction Materials Co.*, 465 F.2d 1157 (5th Cir. 1972); *Producer's Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966); *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959). In *Robison*, we held that the entry of summary judgment for the defendant in a Jones Act case on the ground that the plaintiff lacked seaman's status was improper and that there was an evidentiary basis to submit that question to the jury

> "(1) if there is evidence that the injured workman was assigned permanently to a vessel . . . or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the

accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips."

266 F.2d at 779.

Ardoin has not seriously urged that the record in this case contains evidence to suggest that he performed a substantial part of his work on the vessel. Rather, Ardoin's challenge to the district court's entry of summary judgment relies on the argument that the record contains evidence from which a reasonable person might infer that Ardoin met the requirement of permanent assignment to a vessel (as that requirement has been interpreted in the cases since *Robison* ) and that his work as a structural welder contributed to the function and mission of the vessels to which he was assigned. McDermott has contended that there is no evidence in the record from which one could reasonably conclude that Ardoin was permanently assigned to a vessel because it is undisputed that in the course of his employment Ardoin worked with different derrick barges on different construction projects.

■ In assessing the question whether the record contains evidence to suggest that Ardoin was "permanently assigned" to a vessel, we note at the outset that it is well established that one need not be indefinitely and invariably assigned to one vessel in order to achieve the "permanent" connection required by this prong of the *Robison* analysis. The permanency requirement may be satisfied by assignment to a specific fleet of vessels. *Bazile v. Bisso Marine Co., Inc.,* 606 F.2d 101 (5th Cir. 1979); *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422 (5th Cir. 1977); *Thomas v. Peterson Marine,* 411 F.2d 592 (5th Cir. 1969); *Magnolia Towing Co. v. Pace,* 378 F.2d 12 (5th Cir. 1967); *Braniff v. Jackson Ave.—Gretna Ferry, Inc.,* 280 F.2d 523, 528 (5th Cir. 1960). Thus, if there is evidence from which a reasonable person might conclude that Ardoin was "permanently assigned" to the fleet of derrick barges operated by McDermott, this would suffice to send the question of Ardoin's seaman's status to the jury.

■ McDermott asserts, however, that the undisputed facts concerning Ardoin's work as a structural welder can only support the conclusion that Ardoin and other structural welders were assigned to specific construction projects and not to the derrick barges. We disagree. We believe that given the gloss which our cases have put on the permanency requirement, the evidence concerning Ardoin's work as a structural welder could support a reasonable inference that Ardoin's connection with McDermott's fleet of derrick barges was sufficiently "permanent" to make him a seaman within the meaning of the Jones Act. Our cases have consistently indicated that the "permanency" factor in the *McKie/Robison* analysis is not a literal requirement. The question whether a claimant was "permanently" assigned to a vessel is, thus, "more frequently an analytical starting point than a self-executing formula." *Brown v. ITT Rayonier, Inc.,* 497 F.2d 234, 236–37 (5th Cir. 1974). The "permanency" requirement is, we think, best understood as indicating that in order to be deemed a "seaman" within the meaning of the Jones Act "a claimant [must] have more than a transitory connection" with a vessel or a specific group of vessels. *Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 326 (5th Cir. 1977).

In *Davis,* we affirmed a judgment in a Jones Act case which had been entered on a jury verdict in favor of a welder's helper who was working on an offshore construction project at the time of his injury. The case bore many similarities to this one. In the course of his work on this project, Davis spent a significant amount of time onshore fabricating pipe in preparation for the project. After onshore fabrication was completed, Davis went to the offshore construction site aboard a derrick barge. The derrick barge, like the barges in this case, had a group of employees whose principal duties had to do with the maintenance and operation of the barge itself. Davis, like Ardoin, was not regularly called upon to perform maintenance or other chores for the barge and did not perform a substantial part of his work aboard the barge. Davis

was apparently expected to stay aboard the barge until completion of the project, which was estimated to require 20–30 days; however, Davis left after only a few days because of a wage dispute. In *Davis*, we concluded that from these facts the jury could reasonably have decided that Davis had a sufficiently permanent connection with the derrick barge involved in the construction project to be deemed a seaman and, thus, we affirmed the jury's verdict.

We think that the undisputed facts of this case concerning Ardoin's work as a structural welder could similarly support a reasonable inference that he had a "permanent" connection with the fleet of derrick barges operated by McDermott. The nature of Ardoin's work was such that he never worked except in conjunction with one of these barges, and because the platforms on which he worked were either under construction or being demolished, Ardoin's work always required that he eat and sleep on board these vessels when he was working on a project. The terms of his employment, and the nature of the projects involved, ordinarily required that he remain aboard the barge for more than just a few days. Given these facts, we think that the court erred in concluding that summary judgment for McDermott was appropriate.

McDermott suggests that Ardoin's case is actually less similar to *Davis* than it is to *Kirk v. Land and Marine Applicators*, 555 F.2d 481 (5th Cir. 1977). *Kirk* involved a sandblaster and painter who worked on offshore drilling platforms. Kirk's employer maintained a small fleet of vessels to perform such work. Kirk spent most of his time on the platforms, but the sandblasting machines were operated from the barges. Kirk worked fourteen day shifts; during that period he might work on projects with several of these vessels. Kirk was sometimes quartered on these vessels; sometimes he ate and slept on the platforms. Despite acknowledging the similarities between Kirk's circumstances and those considered in *Davis*, the per curiam opinion in *Kirk* affirmed a summary judgment for the defendant on the grounds that Kirk lacked the "permanent" connection with a vessel or vessels required to make him a seaman.

The factual distinctions between *Kirk* and *Davis* and the instant case are, finally, insignificant ones. Kirk would normally stay offshore only 14 days; Davis, on the occasion of his injury, was expected to remain offshore 20–30 days but actually stayed only two or three days. Kirk sometimes was quartered on the platform, rather than on the vessel, whereas Ardoin and Davis apparently never stayed on a platform; but, it is now clear that merely sleeping and eating aboard a support vessel while working on a fixed platform does not make one a seaman if one does not otherwise meet the *McKie/Robison* criteria. *See, e. g., Owens v. Diamond M. Drilling Co.*, 487 F.2d 74 (5th Cir. 1973). Nor does a failure to do so deprive one of seaman's status if these criteria are otherwise met. *See e. g., Producer's Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966). Thus, this distinction hardly seems definitive. Davis was injured while on the vessel, Kirk and Ardoin were injured on fixed structures; however, the site of one's injury does not affect recovery if one is, in fact, a seaman. *Higginbotham v. Mobile Oil Corp.*, 545 F.2d 422 (5th Cir. 1977); *Noble Drilling Co. v. Smith*, 412 F.2d 952 (5th Cir. 1969). We find ourselves confronted here with a case that bears a strong resemblance to two of our previous cases, which, despite their resemblances to one another, came to divergent results and would appear to support different resolutions of this one. In such circumstances, we can only follow the teaching of the case which appears to reflect sounder reasoning and supports a result more consistent with the general principle that the question of seaman's status in a Jones Act case is ordinarily one for the jury. In this instance, that case is *Davis*.

With regard to the second question in *Robison*'s analysis—whether Ardoin's work contributed to the function or mission of the vessels—we think it clear that a reasonable person could conclude that the work Ardoin performed was work which contributed to the function of, and to the mission of, the derrick barge. The principal func-

tion of such barges is to construct or dismantle offshore platforms. The structural welders might reasonably be found essential to that task.

REVERSED and REMANDED.